May it please the Court, my name is Brittany Tubbs and I represent Plaintiff and Appellant Avery Simmons. I would like to reserve four minutes of my time today for rebuttal. On behalf of the District Court, I ask this Court to reverse the District Court's grant of summary judgment. This case poses the question of whether the severe pervasive standard blocks Miss Simmons' claims from being decided by the trier of fact. When Miss Simmons' co-worker subjected her to leering that escalated into following her around and inappropriately touching her in the workplace. The severe pervasive framework is analyzed within the totality of the circumstances and through the lens of a reasonable woman. This, like all questions of fact, must be considered in the context of the times. The times have changed since the severe pervasive standard was announced in 1986 and since cases decided in 2000. The severe pervasive standard must evolve with the times. In what specific way are you referring to? I certainly agree that things do change. But can you give us a specific case that dealt with that standard that you believe has evolved? And preferably one where our Court has recognized that it has evolved. A case that was very recently decided which was submitted on supplemental briefing is Kenna B. Homeward Bound from the Minnesota Supreme Court. The Supreme Court there stated that in order for the severe pervasive standard to remain useful in Minnesota, it has to evolve with the times. And a reasonable woman in 2020 would not tolerate the same type of workplace behavior that was previously brushed aside as boorish or inappropriately forward. The United States Supreme Court in on-call also directed, and I quote, Common sense and appropriate sensitivity to social context will enable courts and juries to distinguish between simple teasing and conduct which a reasonable person in the plaintiff's position would find hostile and abusive. So we have to look at what the current societal context is for the severe pervasive standard when we're applying it and in the totality of the circumstances. And certainly since 2017, the Me Too movement and additional studies within the judiciary have shown this standard has evolved. What are the best facts in this case that you believe demonstrate a tribal issue as to each element of a hostile work environment claim? So looking at the hostile work environment within the totality of the circumstances as instructed by the United States Supreme Court in Harris and also the Washington Supreme Court in Glasgow. If we're looking at the totality of the circumstances, I believe there is pervasiveness here and that Mr. Schaefer harassed Ms. Simmons over the course of 17 shifts within a matter of two months. It also is pervasive in that there were four people who recognized that Mr. Simmons was staring, one other of which, other than Ms. Simmons, another woman stated that staring made her feel uncomfortable. There's also the fact that this was escalating behavior, continually escalating. So it starts with staring and then moves on to following Ms. Simmons into enclosed spaces like a cooler and then ultimately touching Ms. Simmons on the small of her back, wrapping his arm on the small of her back for several seconds before reaching for a temperature log. And those facts, I do not believe that the district court actually considered. That information was all before the district court and it very briefly brushed over these facts and disaggregated them into pieces. So it analyzed staring and following Ms. Simmons around and determined that those things were not pervasive. But it failed to consider that that happened over every shift that they worked together for 17 shifts over the course of a short period of time, in two months. The district court also then analyzed the touching incident and determined that was an isolated incident, separating it completely from the other incidents that occurred here. Ms. Tubbs, having said all that, what is your basis to impute that responsibility to Higgins? Absolutely. So this actually also goes to the previous question in that Higgins failed to appropriately respond when it learned of the harassment and repeatedly and pervasively dismissed each of Ms. Simmons' complaints. And there are five separate occasions in which Ms. Simmons complained. So the first occasion was on that October 16th date when she complained to her two in-store managers, Ms. West and Ms. Hett. And Ms. West dismissed her complaints and said, he stares at me too. And the only promise that Higgins ever made to Ms. Simmons in response to her complaints was from Ms. Hett who said, we will watch him. And then one half hour later, nobody was watching Mr. Schaefer such that he was able to run his hand across an intimate part of a woman's back and wrap it there and hold her there for several seconds before moving on to a temperature log he didn't need for over a half hour after when this happened. So that failure to respond with the only thing that they guaranteed they would do, we will watch him, is where this starts. But this continues in that no one follows up with Ms. Simmons. And there's really no evidence prior to Ms. Simmons leaving that anyone followed up with Mr. Schaefer either since Ms. Hett did not document, as she had done for previous complaints, that she spoke to Mr. Schaefer. So there's a question of fact as to whether she actually spoke to Mr. Schaefer and told him that there was a complaint about him and that his staring behaviors was inappropriate. And even after that, Ms. Simmons contacts Hagan's corporate office when she doesn't receive any appropriate response that follows Hagan's policies from her in-court level. She goes above what is required of her and contacts corporate offices. And those corporate offices tell her they can't help her. She has to talk to the in-house attorney. That in-house attorney does not contact her and does not start her investigation until several days later after Ms. Simmons reports again to corporate offices and a different in-store manager that she is being harassed. I take your point about how severe and pervasive must change with the times. Does that also affect the speed with which management needs to respond here? I suppose some looking at this from a different time, different era, might say, well, Hagan acted relatively promptly and then she took off and they couldn't do anything about it. What's your response to that? Is that the same kind of an issue, the failure to respond more quickly in this case? I believe that the standard is that there needs to be a prompt response and an effective response. What happened here is that Ms. Simmons reports sexual harassment on the first occasion. And instead of actually doing something about it, her manager sent her back to work with her harasser in which he was able to then escalate his behavior and touch her. So there was no initial response at all. And then the only subsequent responses that seemed to actually have any effect were after Ms. Simmons had already left. So that's seven days had passed where Hagan did not respond at all to Ms. Simmons' complaints. And then by the time that Ms. Simmons called on November 7th to check back in on her complaint, because she still had not heard anything, at that point the investigator hadn't even talked to Mr. Schaffer. And there was no formal store management sitting down and recording that they were telling him he needed to stop his behavior. So I don't think even if you look back at a previous case law that says there has to be prompt action, I don't think that Hagan's response here would meet that. And I certainly would argue that it's not effective in how it responded and that it wasn't reasonably calculated to end or deter harassment. But was eight days enough time to gauge whether or not it was effective? Because from the 16th to the 24th is that eight day period and then she left. So the issue is there's two pieces to having a duty to have a remedial action. One is the effectiveness and the other is also the future deterrence for this and other harassers. As far as assessing the effectiveness here, from Ms. Simmons' perspective to the constructive discharge standard, there was nothing happening. And Hagan did not record or tell Ms. Simmons that they were going to respond to her complaint at all. So from her perspective, there wasn't anything happening to assess the effectiveness. The other piece of this is while Hagan may be telling Mr. Schaefer don't stare at people anymore, he's already violated a Hagan policy. He's already shown he's willing to violate a Hagan policy by taking a break at the same time with her. And the next scheduled shift that they would have had together, they would have been alone without a supervisor, without someone to monitor and make sure that he was going to actually comply with their policies this time. So there's a reasonable belief from Ms. Simmons where there's only been escalating nature and it's only gotten worse since she complained that it was not an effective response from Hagan. The district court erred when it didn't consider the totality of the circumstances and there's several different aspects of this that the court didn't consider. In addition to the few aspects I named above, the court also failed to consider that there was a second complainant. And a second complainant that Hagan could have discovered much earlier if it had actually followed its policies and talked to Ms. Simmons and asked her about her complaints, interviewed her. The court also, the district court, also failed to consider that Ms. Simmons suffered a significant psychological injury such that she had to be taken to the hospital in relation to the sexual harassment. All of these facts have to be taken in their cumulative effect from the lens of a reasonable woman when considering whether this truly affected the terms and conditions of her employment. And based on this court's guidance in EEOC, the prospect airlines, Hagan's failure to act contributes to whether the environment was abusive. I'm just going to ask counsel, what was the total length of your client's employment with Safeway Hagan's? I believe she was employed from February to October within the same year, so about eight months. Okay, thank you. So, Hagan, I see that I'm out of time and I want to reserve it for a rebuttal, so if there's no more questions, you may. Okay, great. Very well, okay, we'll hear from Mr. Hawks, please. May it please the court, Peter Hawks on behalf of Apelli Hagan P.E. Pharmacy. I'm going to focus most of my argument as the opening argument was on the hostile work environment claim. Hagan was entitled to summary judgment on that claim because there was no evidence sufficient to create a tribal issue effect on three separate elements of that claim. First, there's no evidence that Mr. Schaeffer's conduct was based on sex. Second, as a matter of law... Oh, counsel, counsel, that's kind of a silly argument, isn't it? We're talking about a reasonable woman, a modern woman, and I tell you, the women that I know in my life, from my wife to my daughters to my granddaughters, would be very, very upset if they've been working with somebody and kept staring at them. And she said she thought that the man was essentially undressing her in his mind. And then he reaches over and touches her, and he goes back there right after she's complained. How can you take the position that everything's just fine? I don't get that. Well, the answer to that is, first, there's evidence in the record shows that he stared at both men and women. His explanation for that is... Who cares? Who cares? If you have facially neutral behavior, which this is, then what you have to... What the complainant has to demonstrate is that there is an objective difference in the quantity or quality with respect to men and women. And that simply is absent in this record. Are you saying that because he stared at both men and women, that we don't use the reasonable woman standard in analyzing whether Ms. Simmons was sexually harassed in that case? No, I'm not saying that at all. But that goes to the separate element of whether the conduct was severe or pervasive. And that's where the reasonable woman standard is going to apply. But whether the conduct was based on sex, Simmons must show that, objectively, the conduct was directed disproportionately towards women rather than men. In her own testimony, if you look at ER-322, when she's asked, what is it that he did that bothered you? She says the way he acts towards people. Not towards women, towards people. And in ER-323, just a page later in her deposition, she's asked, well, did he behave this way towards others? And she says, I wasn't paying attention. So there's no evidence that this behavior, no objective evidence that this behavior was directed. But there's no evidence here that Schaefer stood close to men, followed men around, or even touched men on their waist, is there? There's not. But, again, all we have is anecdotal evidence. So it's really impossible to, based on the sample size of what we have here, to really make any sort of judgment as to whether this is behavior directed because she's a woman versus because she's a co-worker. Counsel, at what point, if any, did management, on-site management, tell Simmons, tell the man that Ms. Simmons found his behavior objectionable? That happened within a day of when she made the complaint on October 16th. What was his response? His response was, I didn't realize that I was doing anything objectionable. I wasn't trying to upset anyone. And I will try to change my behavior. And there's no evidence. And it was effective. There's no evidence that there was any further issue with his behavior after that conversation. I thought he touched her on the rear end, basically, at part of the next shift, literally, after she had complained. That was half an hour after the initial complaint. There's no evidence. Until after he complained, or she complained. Right. But there's no evidence that that was after the conversation occurred. The response has to be prompt. But half an hour is hardly a reasonable amount of time, even for a prompt response. And certainly, to talk to him within a day, which the evidence shows that they did, is certainly, by any standard, a reasonably prompt response. Counsel, was the manager who said, don't worry, he stares at me, too, a man or a woman? He was a woman. But again, there's no evidence that she found his behavior objectionable, or was concerned about it, or found it in any way problematic. She just noted, yeah, he does the same thing to me. It's an individualized inquiry, isn't it? Well, there's two aspects to it. And we're getting to the second element here, which is the severe or pervasive standard. And it's individualized in that the plaintiff has to subjectively find that the conduct is severe or pervasive. But there's also the objective reasonable woman standard. So you do have both an individualized inquiry, as well as a more objective inquiry that says, did a reasonable person subjected to the same conduct find that it interfered with their ability to do their work? And in this case, that's clearly not the case. Well, first, let's talk about whether it's severe. We have here an individual who is merely looking at someone. Other than the one incident which I'll talk about in a moment, the touching incident. Merely looking at someone, she complains that he follows her around or he stands too close to her. But we don't have anything like you see in cases that find that there's evidence of severity, which are things like sexualized comments, touching of intimate body parts. Here we have the evidence shows that he touched her back and was reaching around her to get the temperature log, but he doesn't touch her buttocks. He doesn't touch her breasts. He doesn't touch her genital area. Nothing like that. Counsel, let me ask you this. Let's assume for a moment that, again, looking at it from the perspective of a reasonable woman, let's assume that, in this case, Simmons or any other reasonable woman thought that this man was following her around, was, in effect, undressing her with his eyes, staring at her, maybe imagining what he and she might do in an intimate setting. Would that be upsetting to a reasonable woman? I don't think that that can be inferred. You have to separate her subjective perception of how she perceived the behavior from the behavior itself because I don't think that there's any way that you can determine what's going on in someone's mind. Well, as of now, we have some criminal statutes that actually do penalize that kind of conduct in certain settings. Again, her description of her subjective reaction to it only goes to that portion of that element, which is her subjective reaction to his behavior, but there's simply no evidence that, on an objective basis, that this is severe behavior. We have numerous cases that we cited in our brief that involve staring-type behavior that is much worse than this. Wouldn't what Mr. Schaffer has alleged to have done in staring and standing too close for 17 shifts, wouldn't that be pervasive conduct? Well, first, there's no evidence in this summary judgment record that they worked 17 shifts together. The first that I've heard that is in the opening argument here today. There's simply no evidence on this summary judgment record as to how often they worked together, nor is there evidence that the entire time during however many shifts that they worked together, that he was staring at her the entire time. Again, that's just simply absent from the record that we have in this case. We do know that they only worked together two months, and certainly in terms of pervasiveness, the touching incident was a single incident. That can't be pervasive. There's just simply nothing in the record that evidences the frequency of any sort of objectionable staring. The way she describes the conduct, she claims that it escalates over time, but she doesn't explain at what point it became objectionable. She does say that I was subjected to sexual harassment starting on October 16th, which is the day that she made the complaint, which suggests that anything that happened before that didn't rise to the level of being severe enough for her to have a problem with it. The third issue that we have is whether the conduct can be imputed to Hagen. Because he's a co-worker, he's not a supervisor, we don't have responding superior liability here. It's based on negligence. What Simmons would have to show is that Hagen knew or should have known of the conduct and failed to take prompt and effective remedial action to stop it. Here the timeline is really the key because we need to look at what did Hagen know and when did it know it, and what did it do in response, and what conduct did Ms. Simmons suffer at various points in that timeline. Let's start with October 16th, 1 o'clock p.m. This is when she first makes the complaint to Hagen. The complaint at that point is only about the staring, he stares at me, he follows me around conduct. The evidence shows, again, as we discussed, within a day of that, Hagen coached him on that conduct and reminded him of the sexual harassment policy, let him know that this could make co-workers feel uncomfortable. And there's no evidence that it never occurred again. Half an hour after she makes the complaint, which again is hardly sufficient time to even have that conversation, this touching incident occurs when they are standing at the end of a narrow hallway, she's looking at the schedule and he's reaching for the temperature log that's right next to it. She doesn't report that to anyone for a week. Not until the day before she is scheduled to work with him again on October 23rd. That is the first time that she tells anyone about the touching incident. In the meantime, on October 20th, she makes a phone call to the Hagen headquarters and complains about sexual harassment that she claims that management has not done anything about. At that point, Hagen launches an investigation. The evidence shows clearly that the investigation began that day. Ms. Parks, the in-house counsel who was investigating the incident, phoned the store, spoke to Ms. Hett, learned what the allegations were, and learned that he had been previously coached in response to the complaint that was made on the 16th. Fast forward, that's a Friday. We then go to the following Monday, October 23rd. Only at that point, when Ms. Simmons starts on her shift, does she say anything about the touching incident. She tells her manager, Jennifer Barker, about it. Then she makes another call to the corporate headquarters. At that point, Ms. Parks, twice, tries to reach her by telephone. She's inadvertently dialing the wrong phone number, unable to reach her. She sends an email to the store. She says, if I'm not able to reach her today, someone needs to talk to her and give her a statement, first thing when she clocks in tomorrow morning. But she doesn't show up. So, Hagan had no opportunity to demonstrate that, first, the remedial measures that it had taken were effective, because she never worked with him again after the day of her initial complaint. And, second, she failed to take advantage of the remedial measures that it was already undertaking, because she didn't show up for work when her statement was going to be taken. It's important to note here that she knew that they were going to talk to her when she came in on the 24th, because she was told that she needed to show up for work that day so that her allegations could be properly addressed. Now, in their reply brief, an appellate argues for the first time, well, that's hearsay, because it's in this memorandum that was prepared by Ms. Parks. But, first of all, they never made that objection in the district court, nor did they make it prior to their reply brief. But, furthermore, an appellate actually cited not only the same document, but the same sentence in the same document, both below and in her opening brief. So, there's really no argument that there's a hearsay problem here. So, she knew that, hey, they're taking steps to address your concerns, and yet she failed to show up for work so that her statement could be taken. What evidence, counsel, what evidence is there that she intentionally failed to show up for work, knowing what was waiting for her? It's at ER 416, which is the memorandum from Ms. Parks, that shows that she was told that she needed to show up for her next shift so that her allegations could be properly addressed. And that was told to her by the person who answered the phone when she called the corporate office on October 23rd. Now, certainly, you know, there's evidence in the record that she was upset, that she went to the hospital with a panic attack. But, at the same time, she turns around and quits the next day, again, without giving Hagan the opportunity to even talk to her, to interview her, to conduct its investigation, or to demonstrate that, hey, we've already talked to him, and we think that this problem is now solved. So, if the panelists... If time is up, do you think you need to wrap up, or are we all set? I think that's it, Your Honor. Any other questions by my colleagues? No. No questions? Very well, then, Ms. Tubbs, you have a little bit of time left. Not much, but some. There you go, you have a lot, do you? You have lots. Thank you, Your Honor. My colleague here points out, first, two genuine issues of fact that are still present, and one of those is when or if Hagan ever coached Schaefer, specifically if Lillian had ever coached Schaefer, and if that happened before he touched her or after he touched her. This would certainly go to whether that coaching was effective, if Ms. had coached him prior to touching her, and then he proceeded to go touch her right after that coaching. Even if it was after, though, and that was the last incident, that is still not an effective, that still is not a, Hagan has not met its duty in effectively and promptly responding to the harassment. This is because Hagan has a duty to, under Ellison, until Falker, Fuller, and Renega, Hagan has a duty to firmly state that it opposes sexual harassment, and it did not do that here. To the contrary, all it did was exactly what Ellison states you cannot do. Title VII requires more than a mere request to refrain from discriminatory conduct, and yet that is all Hagan claims that it did, is to tell him, please stop staring. There is no evidence in the record at all, and it did not happen, to my knowledge, that Hagan ever told Mr. Schaefer to not touch another employee, even after he had learned, that they had learned about him touching Ms. Simmons, or to not follow employees around the workplace, and especially into small, confined areas, to not take a lunch at the same time as another employee. So all of those actions, other than staring, have still been unaddressed, based at least on the record before the court. Hagan's response does not meet its required duty under the Fuller, Renega, Intel, Falker, and Ellison cases. I know we may not really get to this much, but, of course, one of the claims that was made initially was that there was a retaliation against her by having some notices of failure to comply with company policy. Aside from the temporal proximity, what evidence do you have that demonstrates that Hagan's legitimate, non-retaliatory reasons for issuing the notices were pretext? Sure. So in addition to the temporal proximity, for instance, one of these notices was for absences, and this was Ms. Simmons' fifth absence, according to record ER 97. However, Hagan's policy requires Hagan to issue a verbal warning on the fourth absence. That fourth absence would have occurred on September 25th, according to ER 97, yet Hagan did not actually follow its policy then to issue her a verbal warning. It only waited until after Ms. Simmons' complaint, nearly over a month later before it actually issued a warning for this. So Hagan has not provided any reasoning on why there was a delay at all. There is nothing in the record in which it's responded to that. I do want to note that there is evidence in the record that there were 17 shifts in which Ms. Simmons and Mr. Schaffer worked together, and that's at ER 155, 157, 159, and 161. And each time over those shifts, Ms. Simmons testified that every time she worked with him, he stared at her and stood too close. And her evidence on summary judgment standard is to be believed. I want to conclude with the Title VII and Washington's Law Against Discrimination's goal is to... I think that I'm out of time. May I conclude real quick?  Thank you, Your Honor. The goals of Title VII and Washington's Law Against Discrimination are to eliminate discrimination in the workplace. And if this court is affirming the district court's dismissal, it will be telling future plaintiffs that they are not protected from being in an environment of leering, following around, and inappropriate touching. And the court would be essentially ratifying Hagan's response with corrective action, meaning in which it said, quote, those behaviors are very much okay. The district court can apply outdated standards. Very good. Thank you very much. We thank both counsel for your arguments. Very helpful. We thank you. And the case of Simmons v. Safeway is now submitted.
judges: Fisher, Hawkins, M. Smith